WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America ex rel. W. Austine Sallade,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Orbital Sciences Corporation,<br><br>　　　　Defendant. | No. SC05-00604-PHX-NVW |

The court has considered Defendant Orbital Sciences Corporation's ("Orbital") Motion to Dismiss for Failure to Plead Fraud with Particularity pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) (Doc. # 38).

**I. Background**

On February 23, 2005, Plaintiff W. Austin Sallade ("Sallade") filed an action against Orbital in the name of the United States Government under the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.* The FCA permits whistleblowers, known as *qui tam* relators, to file suits alleging that a defendant committed fraud on the government by "knowingly" presenting to the government a "false or fraudulent claim for payment or approval," § 3729(a)(1), or "knowingly" making or using a false record or statement to get such a claim paid or approved, § 3729(a)(2). Sallade's Complaint alleges seven counts of FCA and Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306a, violations committed by Orbital.

1  Sallade was an Orbital employee at the time he submitted the Complaint. After
2  Sallade filed his Complaint, the government reviewed and investigated the matter for
3  more than two years. During that time, the matter remained under seal; the government
4  obtained four extensions of the seal to continue its investigation. On June 29, 2007,
5  counsel for the United States notified the court that the United States was continuing its
6  investigation but not intervening at that time to take over the prosecution of this action.
7  *See* 31 U.S.C. §§ 3730(b)(1), 3730(b)(4)(B). On July 9, 2007, the Court unsealed the
8  case and directed Sallade to effect service. Orbital waived service on July 30, 2007. This
9  motion followed.

10  In Count I Sallade asserts that in 2001 Orbital won a contract to execute a satellite
11  launch for the Taiwanese Government ("the ROCSAT2" contract), but had underbid for
12  the contract by about $10 million due to necessary research and development expenses.
13  (Compl. ¶¶ 107, 109.) Therefore, he alleges, Orbital initiated several "Independent
14  Research & Development" (IR&D) projects that it could bill on an indirect cost basis to
15  other contracts that it had with the U.S. Government. (*Id.* ¶¶ 18–23, 112–15.) Sallade
16  asserts that he warned Orbital's senior finance management about the impropriety of this
17  practice in the fourth quarter of 2003 (*id.* ¶ 34), and that Orbital's Senior Vice President,
18  Mr. Jim Utter, acknowledged to him that the money spent on the IR&D projects was
19  actually attributable to the ROCSAT2 contract (*id.* ¶ 35). Orbital purportedly assigned its
20  Deputy Program Manager for the ROCSAT2 contract to manage the IR&D contracts,
21  though such contracts are usually assigned to Orbital's functional engineers. (*Id.* ¶ 36.)
22  Sallade alleges that Orbital wrongfully billed the U.S. Government for about $5 million
23  worth of costs directly attributable to the ROCSAT2 contract. (*Id.* ¶ 116).

24  Count II regards Orbital's Ground Missile Defense ("GMD") subcontract with
25  Boeing, Inc. ("Boeing"), under which it acquires rocket motors that Boeing needs to
26  fulfill its primary contract with the U.S. Government Missile Defense Agency. Orbital
27  acquires those engines from ATK Aerospace Company, Inc. ("ATK"). (*Id.* ¶¶ 38–41.)
28  Sallade alleges that on or around June, 2003, Orbital financed additional production

1 capacity for ATK and then charged it as a direct cost to Boeing, and ultimately to the U.S.
2 Government.  He asserts that Orbital did so without determining whether ATK had used
3 the finances to acquire plant, equipment, or other facilities that could only be charged as
4 indirect costs.  (*Id.* ¶¶ 120–30.)  The invoices submitted by ATK to Orbital apparently
5 contained no such detail.  (*Id.* ¶ 125.)  According to Sallade, Orbital wrongfully billed the
6 U.S. Government for at least $1 million in this manner. (*Id.* ¶ 131.)
7       In Count III Sallade alleges that under Orbital's GMD subcontract with Boeing,
8 and also under its contracts with the Air Force, Orbital charges the U.S. Government for
9 common hardware and test equipment as direct costs when it should charge those
10 expenses as indirect costs.  (*Id.* ¶¶ 56, 133.)  As an example, Sallade alleges that Orbital
11 had charged four items of test equipment as indirect costs at the commencement of the
12 GMD subcontract.  (*Id.* ¶ 135)  According to Sallade, Orbital's Senior Vice President, Mr.
13 Utter, later stated that "we will convince the government that the items are 'special test
14 equipment' to be directly charged to the GMD subcontract" because "Orbital can't be
15 expected to afford capital investments without any guarantee of future contracts."  (*Id.* ¶
16 136.)  Orbital thereafter allegedly billed similar items of test equipment as direct costs to
17 the GMD subcontract.  (*Id.* ¶ 135.)  Sallade also asserts that similar items of test
18 equipment had previously been billed as indirect costs on the ROCSAT2 contract.  (*Id.* ¶
19 133.)  The improper switch to direct billing has purportedly resulted in no less than $1
20 million in improper charges to the U.S. Government.  (*Id.* ¶ 136–38.)
21       Count IV concerns Orbital's acquisition of facilities, equipment, and material
22 under its contract with the Air Force for the Orbital Sub-Orbital Program ("OSP 1").
23 Sallade alleges that Orbital improperly billed the U.S. Government on a direct costs basis,
24 but kept no records of how it used the property acquired, which lawfully belonged to the
25 government.  (*Id.* ¶¶ 62–66, 140–42.)  After the government approached Orbital about
26 this practice in response to Sallade's accusations, Sallade asserts that Orbital reclassified
27 the equipment as "Special Test Equipment," which it can bill on a direct cost basis, even
28 though the law requires Orbital to treat the facilities, equipment, and material as indirect

- 3 -

1  costs. (*Id.* ¶¶ 67–70, 143–46.)  Allegedly, Mr. Utter has stated that this practice allowed
2  Orbital to compete for and win a follow-on contract ("OSP 2") without having to include
3  the cost of the necessary facilities, equipment, and material in its bid because the
4  government had already paid for it. (*Id.* ¶ 148.)  Sallade further asserts that Orbital has
5  pervasively applied such billing schemes under other contracts with federal agencies and
6  prime contractors, causing the U.S. Government to subsidize its contract performance,
7  and resulting in no less than $10 million in damages. (*Id.* ¶¶ 150–53.)

8        In Count V Sallade alleges that under the GMD subcontract Orbital directly bills
9  Boeing, and ultimately the U.S. Government, for "supplier management" and "supplier
10 quality" personnel.  According to Sallade, that personnel actually perform general, multi-
11 contract functions and therefore should be billed on an indirect cost basis. (*Id.* ¶ 155–63.)
12 He asserts that Orbital in fact charges its other customers for similar personnel on an
13 indirect cost basis, but that it has intentionally and unlawfully charged the U.S.
14 Government on a direct cost basis for at least $1 million of such labor costs. (*Id.* ¶¶ 156,
15 158, 163, 164.)

16       In Count VI Sallade alleges that in the spring of 2004, Mr. Utter directed that
17 Orbital delay reporting expected cost under-runs it was experiencing on certain Boeing
18 subcontracts so that it could inflate its expected costs on the Capability Enhancement I
19 ("CH I") subcontract with Boeing, for which it was then negotiating a price. (*Id.* ¶
20 171–76.)  Sallade asserts that he did so despite Sallade's warning that Orbital had to
21 disclose the under-runs (*Id.* ¶ 174.), and that intentionally concealing such "cost and
22 pricing data" violates TINA. (*Id.* ¶ 177.)  He further asserts that the improper billing
23 practices described in Counts I through IV also violate TINA. (*Id.* ¶¶ 178–81.)  The
24 alleged damages to the U.S. Government are in excess of $10 million. (*Id.* ¶ 182.)

25       In Count VII Sallade alleges that Orbital improperly charges the U.S. Government
26 for spare and excess materials before it needs the materials to perform its contracts. (*Id.*
27 ¶¶ 184–85.)  He asserts that Orbital improperly transfers the material for use on other
28

- 4 -

1  contracts (*id.* ¶ 186), resulting in at least $500,000 worth of damages to the U.S.
2  Government (*id.* ¶ 189).

**II. Standard for Pleading an FCA Violation Under Rules 9(b) and 12(b)(6)**

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The requirement to plead fraud with particularity ensures that defendants have sufficient notice of the specific misconduct that is allegedly fraudulent "so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001). It also protects defendants' reputations from harm and minimizes costly fishing expeditions. *Id.* at 1018. Complaints brought under the FCA must satisfy Rule 9(b). *Id.* at 1015.

A motion to dismiss for failure to plead with particularity is the functional equivalent of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Vess*, 317 F.3d at 1107. Accordingly, Sallade must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Liability under the FCA attaches not to the underlying fraudulent scheme, but to the submission of the false claim itself. *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002). Therefore, to state a claim for relief under section 3729(a)(1) of the FCA, Sallade must allege facts that plausibly prove that: "(1) [Orbital] made a claim against the United States (2) that was false or fraudulent (3) with knowledge of the falsity or fraud." *Id.* at 1000. Under section 3729(a)(2), Sallade must allege facts showing that Orbital used a false record or statement to get a false claim paid. *United States ex rel. Harris v. Alan Ritchey, Inc.*, 2006 U.S. Dist. LEXIS 91921 at *5–6 (W.D. Wash. Dec. 20, 2006) (citing *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003)). To use a TINA violation as the basis for an FCA claim, Sallade must show that Orbital presented claims for payment under a government contract knowing that it had failed to disclose pertinent "cost and pricing

1  data" during negotiations for the contract.  *See United States ex rel. Sanders v. Allison*
2  *Engine Co.*, 471 F.3d 610, 623 (6th Cir. 2006).

3        The heightened pleading requirement of Rule 9(b) applies to each element
4  described above, except that "[m]alice, intent, knowledge, and other conditions of a
5  person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Sallade's Complaint must
6  include the "'the who, what, when, where, and how' of the misconduct charged."  *Vess v.*
7  *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*,
8  137 F.3d 616, 627 (9th Cir. 1997)).

9        However, Sallade need not "allege, in detail, all facts supporting each and every
10  instance of [fraud] over a multi-year period."  *United States ex rel. Lee v. Smithkline*
11  *Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001) (citing *Cooper v. Pickett*, 137 F.3d
12  616, 627 (9th Cir. 1998)).  "Where a relator pleads a complex and far-reaching fraudulent
13  scheme with particularity, and provides examples of specific false claims submitted to the
14  government pursuant to that scheme, a relator may proceed to discovery on the entire
15  fraudulent scheme."  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d
16  493, 510 (6th Cir. 2007).  *Accord Lee*, 245 F.3d at 1051; *United States ex rel. McCarthy*
17  *v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 2d 1062, 1068 (D. Haw. 2001).  In such an
18  instance, "the claims that are pled with specificity must be characteristic examples that
19  are illustrative of the class of all claims covered by the fraudulent scheme."  *Id.* at 510–11
20  (citation and internal quotations marks omitted).

21  **III.  Discussion**

22        All of the Complaint's counts meet the heightened pleading requirements for an
23  FCA violation except Counts V, VI, and VII.  Count I alleges that after winning the
24  ROCSAT2 contract in 2001, Orbital used IR&D projects to fraudulently bill the U.S.
25  Government for $5 million in costs, despite Sallade's warning to Orbital's senior finance
26  management in the fourth quarter of 2003 that such billing was improper.  He asserts that
27  Orbital's Deputy Program Manager for the ROCSAT2 contract managed the IR&D
28  projects, and that Sr. Vice President Utter admitted to him that the charges were properly

- 6 -

1  allocable to the ROCSAT2 contract. Sallade has therefore alleged the "who, what, when,
2  where, and how" of Orbital's knowing submission of a false claim to the U.S.
3  Government.
4  He has done so with sufficient circumstantial detail so that Orbital can identify the
5  specific transaction in question and defend against the charge. He need not identify by
6  name the IR&D projects used or specify the exact dates that Orbital submitted the
7  charges. *See United States ex rel. Lincoln v. Med-Data, Inc.*, 2006 U.S. Dist. LEXIS
8  64288 at *7–8 (W.D. Wash. Sept. 8, 2006) (holding that the *qui tam* relator need not
9  supply the level detail that the defendant sought where the information supplied was
10 "adequate for [the defendant] to both identify the transaction in question and to challenge
11 the basis for Plaintiff's allegation that claims were fraudulently submitted"; *McCarthy*,
12 140 F. Supp. 2d at 1068 (holding that a complaint that did not include "specific dates or
13 people" nevertheless "spell[ed] out with sufficient clarity for what actions Defendants are
14 expected to answer").
15 Similarly, Count II does more than allege a potentially fraudulent scheme. It
16 alleges that Orbital invoiced the U.S. Government, through Boeing, for costs incurred by
17 ATK to acquire additional production capacity. Sallade need not specify the exact
18 equipment that ATK purchased, the exact date that Orbital allegedly passed ATK's costs
19 to Boeing, the exact person that sent the invoices to Boeing, or the exact date that Boeing
20 passed the costs to the U.S. Government. Rule 9(b) does not demand that relators always
21 include such minute details in their complaints. *Lincoln*, 2006 U.S. Dist. LEXIS 64288 at
22 *7 (noting that details concerning dates, identification numbers, amounts charged,
23 particular goods or services included, and individuals involved in preparing bills are
24 "types of information that may help . . . [but] do not constitute a checklist of mandatory
25 requirements" to state a claim with particularity).
26 Sallade included sufficient circumstantial detail for Orbital to defend against the
27 charge. He asserts that after an increased demand for motors in June 2003, ATK
28 submitted invoices to Orbital for costs it incurred in acquiring additional production

1 capacity. The invoices allegedly did not contain detail on the material or equipment
2 purchased. Orbital invoiced Boeing for at least $1 million of those costs knowing that it
3 was improper to do so on a direct cost basis, and Boeing ultimately invoiced the U.S.
4 Government for those costs. This is enough detail for Orbital to identify the transactions
5 in question and defend against the charges.
6 With respect to Count III, Orbital again complains that it does not identify the
7 exact test equipment or common hardware that Orbital allegedly billed to the U.S.
8 Government on a direct cost basis, and that it does not state the exact dates that such
9 billing occurred. It does, however, assert that Orbital billed as indirect costs four pieces
10 of test equipment that it acquired at the commencement of the GMD subcontract
11 ("when"). Sallade quotes Mr. Utter ("who") directing Orbital to switch to billing such
12 items as direct costs because he felt Orbital should not have to invest its resources without
13 a guarantee of future production orders from the government. He alleges that Orbital
14 followed this directive and later did bill similar items ("what") as direct costs to the GMD
15 subcontract ("how"). Given this circumstantial information, Orbital should not have
16 trouble identifying the equipment in question. Furthermore, Sallade uses this transaction
17 as an example of the improper billing practices that Orbital has used under the GMD
18 subcontract and its contracts with the Air Force. Therefore, with respect to those
19 contracts, Sallade may proceed to discovery on Orbital's improper direct billing for
20 common hardware and test equipment.
21 Similarly, given the circumstantial information in Count IV, the mere fact that
22 Sallade did not put a name to the equipment that Orbital allegedly billed to the U.S.
23 Government or specify the exact date that it charged the government does not mean that
24 the count fails the Rule 9(b) standard. Count IV states that Orbital acquired the facilities
25 and non-deliverable support equipment under the OSP1 contract, that the government
26 approached Orbital about the items in response to his allegations, and that Orbital then
27 reclassified the items as "Special Test Equipment." Mr. Utter allegedly referred to this
28 very equipment in a statement about how Orbital won the OSP2 contract. Sallade

- 8 -

1  proffers this transaction as an example of how Orbital unlawfully bills the acquisition of
2  facilities and non-deliverable support equipment to the government on a direct cost basis
3  under one contract and then uses it to perform other contracts, thereby gaining an
4  improper advantage when competing for government contracts.  He may proceed to
5  discovery on the alleged fraudulent scheme that is typified by these billing practices
6  under the OSP1 transaction.

7        Counts V and VII, on the other hand, do not meet Rule 9(b)'s heightened pleading
8  requirements.  Count V does not mention the identities or specific job tasks of the
9  employees that Orbital allegedly directly billed to the U.S. Government.  Nor does it
10 specify when they were hired or to what contract their services were billed.  Though it
11 alleges that Orbital charged for similar employees on an indirect cost basis under other
12 contracts, again the Complaint does not provide any information about who those
13 employees were, what their jobs were, when they were hired, or to what contracts their
14 services were charged.  Count VII similarly does not link the spare or excess material to
15 any specific contract, person, or time frame.  This is not to say that all of such information
16 must be alleged to state a claim.  The important difference between these counts and the
17 counts that do satisfy Rule 9(b) is that Counts V and VII contain no circumstantial
18 information that would allow Orbital to identify the specific fraudulent claims in question
19 or defend against the charges.

20       Count VI asserts that Orbital has violated TINA in various ways.  Sallade brings
21 this action as a *qui tam* relator under the FCA.  A relator can plead that an individual
22 violated the FCA by submitting a claim for payment knowing that it had failed to disclose
23 "cost and pricing data" when it negotiated the government contract.  *See Sanders*, 471
24 F.3d at 623.  Sallade alleges that Mr. Utter directed that Orbital delay reporting expected
25 cost under-runs in violation of TINA so that it could inflate its expected costs on the CH I
26 subcontract.  Though this pleading might be sufficient to state a TINA violation, it does
27 not sufficiently allege a cause of action under the FCA.  To do so, the Complaint must
28 also plead with particularity that Orbital submitted a claim for payment under the CH I

- 9 -

1  contract despite knowing that it had failed to disclose the required information during
2  negotiations.
3       Count VI also alleges that the actions detailed in Counts I through V constitute
4  TINA violations.  The pleadings do not clearly state how Orbital's actions allegedly
5  violate TINA, as opposed to the FCA.  For example, they do not adequately identify the
6  contracts that Orbital negotiated with the government without disclosing the required
7  information.  Furthermore, these pleadings do not specify in detail how or when Orbital
8  submitted claims for payment under those contracts, knowing that it had failed to disclose
9  "cost and pricing data" during negotiations.  Count VI therefore does not fulfill Rule
10 9(b)'s heightened pleading requirement for fraud.
11      IT IS THEREFORE ORDERED that Defendant Orbital Sciences Corporation's
12 ("Orbital") Motion to Dismiss for Failure to Plead Fraud with Particularity pursuant to
13 Federal Rules of Civil Procedure 9(b) and 12(b)(6) (Doc. # 38) is granted in part and
14 denied in part.  The motion is denied with respect to Counts I, II, III, and IV.
15      IT IS FURTHER ORDERED that Counts V, VI, and VII are dismissed for failure
16 to plead fraud with specificity, with leave to amend by January 18, 2008.  Counts V, VI,
17 and VII will be dismissed with prejudice if an amended complaint is not filed by January
18 18, 2008.
19      DATED this 4th day of January 2008.

_____
Neil V. Wake
United States District Judge